**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DONALD BRYNELSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 17 C 8695** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Donald Brynelsen seeks review of the final decision of the Commissioner of the Social Security Administration, finding that the Plaintiff was not disabled and denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Brynelsen asks the Court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming it.

Mr. Brynelsen applied for Disability Insurance Benefits on October 17, 2014, alleging that he had been disabled since May 8, 2014. (Administrative Record ("R.") 165-66). Mr. Brynelsen's date last insured was June 30, 2014. (R. 21, 60). His claim was initially denied on November 21, 2014 (R. 71), and again, upon reconsideration, on March 19, 2015. (R. 84). Mr. Brynelsen then requested an administrative hearing. (R. 99). An Administrative Law Judge ("ALJ") presided over the hearing on October 17, 2016, at which Mr. Brynelsen, represented by counsel, appeared and testified. (R. 32). On November 25, 2016, the ALJ issued a decision denying Mr. Brynelsen's claims. (R. 27). Mr. Brynelsen then requested review of the ALJ's decision by the Appeals Council,

which was denied on September 21, 2017. (R. 14). Mr. Brynelsen has appealed that decision to the federal district court under 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

# I.

## A. Vocational Background

Mr. Brynelsen, born on January 25, 1959, (R. 165), was fifty-seven years old at the time of the ALJ's decision. (R. 27). Mr. Brynelsen has never married and has no children. (R. 317, 483). He is approximately 5' 11" tall and weighs 325 pounds. (R. 60). Mr. Brynelsen earned his bachelor's degree from Carthage College in 1981, with majors in journalism and English and a minor in history. (R. 47, 189).

Mr. Brynelsen has not been employed since he was fired from Wal-Mart, and he is financially dependent upon his family members. (R. 336). He worked there as a service writer in the automotive department, from October 2002 to February 2009. (R. 39, 195, 196), and was terminated after he behaved rudely to a customer, who complained to his supervisor. (R. 40-41). Mr. Brynelsen claims that he has often been fired from past jobs due to his tendency to avoid responsibilities or to hide undone tasks to avoid criticism. (R. 289, 316). Indeed, from 1997 until the onset date of his alleged disability, the record reflects that Mr. Brynelsen worked sporadically for a few different employers, including collection agencies, an employment agency, and retail businesses. (190, 195-200).

In October 2015, Mr. Brynelsen began regularly meeting with Mark Oldenbrug at the Kenneth Young Center. Mr. Oldenbrug assists Mr. Brynelsen in pursuing job leads and completing job applications. (R. 395). Mr. Brynelsen has submitted several job applications in the past year, but he reports receiving no call-backs after interviews. (R. 49, 418). Most of the positions that he has

2

applied for with Mr. Oldenbrug are in customer service at large retail stores. (R. 416, 430). Since the alleged onset of his disability on May 8, 2014, Mr. Brynelsen worked for one month in 2016 at a Sears store before he was terminated. (R. 35, 181). At his administrative hearing, he testified that he was fired from this position because he was unable to "keep up" with younger co-workers and that the store was cutting its budget. (R. 35).

## B. Medical Record

Mr. Brynelsen first sought treatment at the Kenneth Young Center for a year in the 1990's, during which time he received psychiatric treatment and was prescribed anti-depressant medication. (R. 300, 336, 337). The record indicates that he began receiving regular care at the Kenneth Young Center in July 2012. (Joint Statement of Facts, 2). Mr. Brynelsen's treating psychiatrist, Jerry J. Gibbons, M.D., assessed Mr. Brynelsen on July 13, 2012 and noted that Mr. Brynelsen has a history of avoidant behavior, social withdrawal, depression, and episodes of euphoria. (R. 276).

On October 4, 2012, Dr. Gibbons conducted another psychiatric evaluation of Mr. Brynelsen. (R. 336). In this examination, Mr. Brynelsen reported that he was experiencing mood swings between feelings of depression and euphoria. (R. 336). Mr. Brynelsen stated that the periods of depression were accompanied by decreased energy, decreased motivation, and insomnia. (*Id.*). During euphoric episodes, he explained that he engaged in impulsive behavior, like singing in public and recklessly spending money. (*Id.*). Dr. Gibbons observed that Mr. Brynelsen was cooperative, his eye contact was fair to good, his thought process was goal directed, and that he displayed fair insight and judgment. (R. 338). He noted that Mr. Brynelsen was obese and diagnosed him with bipolar disorder. (R. 339). The doctor prescribed him Lamictal, a mood stabilizing medication that was dictated by Mr. Brynelsen's obesity. (*Id.*). Dr. Gibbons gave Mr. Brynelsen a handout on bipolar disorder to complete, after discussing his symptoms with his family, and to bring it with him to his

next appointment. (*Id.*).

Mr. Brynelsen met intermittently with Dr. Gibbons for medication monitoring. In June 2013 and August 2013, notes indicated that the prescription medication was decreasing the severity of his symptoms. (R. 341, 346). During the meeting in June 2013, Dr. Gibbons assessed Mr. Brynelsen with a Global Assessment of Functioning ("GAF") score of 45.[1] (R. 342). He also provided him with a new copy of the handout originally given to him in October 2012, to complete with his sister. (R. 341). Mr. Brynelsen thought that maybe he had already completed it, but he could not remember. (*Id.*). In August 2013, Mr. Brynelsen described his symptoms to Dr. Gibbons as stable, which he attributed to his medication and improved diet. (R. 346). Dr. Gibbons observed that his range of affect was constricted and assessed him with a GAF score of 50. (R. 347). Dr. Gibbons also noted that Mr. Brynelsen still had not completed the handout given to him, nor had he discussed his symptoms with his sister.

In August 2013, Mr. Brynelsen had a comprehensive mental health assessment at the Kenneth Young Center. (R. 304-331). Katrina Drummond, M.A., found that Mr. Brynelsen was experiencing symptoms of depressed mood, fatigue, lack of energy, social withdrawal, feelings of worthlessness and inappropriate guilt, diminished concentration, and irritability for over two years. (R. 304, 306). Mr. Brynelsen said he considered these symptoms to be moderately severe at that time. (R. 307). Ms. Drummond indicated that Mr. Brynelsen was obese. (R. 314). She noted that Mr. Brynelsen was able to sustain appropriate attention levels during the examination, was well-oriented

---

[1] GAF scores within the range of 41-50 indicate serious symptoms or impairment in social, occupational, or school functioning. Scores between 51 and 60 indicate moderate symptoms or impairment. *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000). The Social Security Administration still considers GAF scores to be relevant even though another metric replaced GAF scores in the *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (5th ed. 2013) (DSM-V). *See Knapp v. Berryhill*, 2018 WL 3409606, at *1, *4 (7th Cir. 2018).

with his surroundings, demonstrated logical and coherent thought processes, and displayed good judgment. (R. 319-20). She also indicated that Mr. Brynelsen was unable to concentrate and had just a fair capacity for insight. (R. 320-21). In Ms. Drummond's opinion, Mr. Brynelsen was mildly impaired in most daily living activities—including his ability to cope with his disability, to be productive and work independently, and to communicate with others—but she found that his health practices and ability to maintain stable housing were moderately impaired and that his social ability was seriously functionally impaired. (R. 324-25). At the conclusion of her assessment, Dr. Drummond reported that, despite some setbacks, Mr. Brynelsen's symptoms had improved during the course of his treatment. (R. 328).

Mr. Brynelsen stopped visiting the Kenneth Young Center in August 2013 because his health insurance company, County Care Insurance, did not cover treatment at this facility. (R. 334). Mr. Brynelsen then received psychiatric treatment from Aqeel A. Khan, M.D., at Advance Psychiatric & Counseling, from December 2013 to March 2014. (R. 250-254). Dr. Khan reported that Mr. Brynelsen was fully oriented, had intact concentration and attention, but had an anxious or depressed mood, constricted affect, and fair judgment and insight. (R. 252-54).

In July 2014, Mr. Brynelsen returned to the Kenneth Young Center for treatment after County Care Insurance started including the clinic in its coverage plan. (R. 332). Social worker Michael Sada reported some improvements in Mr. Brynelsen's condition, specifically that Mr. Brynelsen was generally not having major mood swings between feelings of depression or euphoria. (R. 276). However, in July 2014, Mr. Sada indicated that Mr. Brynelsen was still exhibiting depressed mood, fatigue, lack of energy, social withdrawal, isolation, worthlessness and inappropriate guilt, irritability, and diminished ability to concentrate. (R. 276-77). In Mr. Sada's opinion, Mr. Brynelsen was mildly impaired in most daily living activities, but his health practices

and ability to maintain stable housing were moderately impaired. (R. 296-97). At the conclusion of the assessment, Mr. Sada assessed Mr. Brynelsen's with a GAF score of 56. (R. 303).

Mr. Brynelsen underwent a psychiatric evaluation with Dr. Gibbons in September 2014. (R. 332). Mr. Brynelsen's main complaint was that he fell into "funks," that caused him to feel like not doing anything. (R. 332). Dr. Gibbons's report indicates that he was never able to confirm his earlier diagnosis of bipolar disorder in November 2012 because his sister, Ms. Patricia Rimac, never completed collateral information forms about his symptoms that would have allowed for Dr. Gibbons to reach a definitive conclusion. (R. 332) Ms. Rimac accompanied Mr. Brynelsen at his appointment with Dr. Gibbons and offered some information on the history of Mr. Brynelsen's limitations. (R. 332-33). Ms. Rimac also expressed her concern that Mr. Brynelsen has been misdiagnosed and that he may fall within the autistic spectrum. (R. 332). At the conclusion of the meeting, Dr. Gibbons decided to diagnosis Mr. Brynelsen as bipolar for the time being, and he assessed his GAF score at 50.[2] (R. 334). After a medication management evaluation in October 2014, Dr. Gibbons further doubted his earlier diagnosis of bipolar disorder and decided to start treating Mr. Brynelsen's symptoms as within the depression spectrum. (R. 353). Dr. Gibbons prescribed Wellbutrin for Mr. Brynelsen to take in addition to low doses of Lamotrigine that he had already been prescribed. (R. 353).

In October 2014, Mr. Brynelsen started attending individual therapy sessions and periodic medication monitoring evaluations at the Kenneth Young Center. (R. 353, 355). During therapy sessions, Mr. Brynelsen frequently described feelings of anxiety, hopelessness, and a lack of motivation. (R. 365, 367, 381, 386). He also shared his struggles with performing household tasks

---

[2] Dr. Gibbons repeatedly assessed Mr. Brynelsen with a GAF score of 50 during subsequent medication monitoring evaluation. (*See, e.g.*, R. 353, 363-64, 371-72, 390).

like cleaning and discarding excess items in his condominium. (R. 365, 366, 370). For instance, at one counseling session, he intimated that he was still working on cleaning a coffee table that he said he had finished clearing at a session the week prior. (R. 365).

In November 2014, state agency psychologist Richard J. Hamersma, Ph.D., reviewed Mr. Brynelsen's records and noted that depression, stress and anxiety, and bipolar disorder caused him moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (R. 63-64). Dr. Hamersma concluded that Mr. Brynelsen was moderately limited in the following areas: his ability to carry out detailed instructions; maintain attention and concentrations for extended periods of time; accept instructions and respond appropriately to criticism from supervisors; and his ability to get along with coworkers without distracting them or exhibiting behavioral extremes. (R. 67). Other abilities—such as the ability to carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine; work in concert with others; and make simple work-related decisions—were deemed not to be significantly limited. (R. 67). He concluded that Mr. Brynelsen could complete one-to-three step tasks. (R. 68). He also noted that Mr. Brynelsen's limitations rendered him unable to perform the work duties required of him in his past jobs, but they did not pose such challenges that would preclude him from doing less demanding, unskilled work. (R. 69-70).

In March 2015, state agency psychologist, Larry Kravitz, Psy.D., reviewed Dr. Hamersma's assessment upon Mr. Brynelsen's request for reconsideration. (R. 72). Mr. Brynelsen reported that his symptoms had worsened; he described increased feelings of worthlessness, having suicidal thoughts, and physical aches since December 2014. (R. 73). Dr. Kravitz assessed the severity of Mr. Brynelsen's condition, noted that no additional medical evidence had been submitted (R. 75), and

affirmed Dr. Hamersma's findings. (R. 76). Dr. Kravitz's impression of the evidence was that Mr. Brynelsen's thought process was mildly disrupted and that his ability to manage a daily routine and engage in social interactions was limited. (R. 77). He concluded that Mr. Brynelsen would require a static work environment, in which he would be required to complete repetitive consistent, predictable, tasks, and where he could avoid public contact. (R. 77).

Marvin Blase, M.D., reviewed the adequacy of Dr. Hamersma's and Dr. Kravitz's assessments in April 2015, and he found sufficient medical evidence to support their conclusions. (R. 356, 359). He noted that the most recent psychological data showed, at most, moderate symptoms, and that he had no basis for disagreement with their findings. (R. 360). Recovery therapists Ms. Miemczewski and Yvonne Morgan conducted the last comprehensive medical assessment of Mr. Brynelsen in the record before the ALJ, on August 10, 2016. (R. 459-487). Ms. Miemczewski and Ms. Morgan noted the following symptoms: depressed mood, fatigue, social withdrawal, inappropriate guilt, neglect of critical role functions, unstable mood, irritability, impulsive behavior, anxious mood, restlessness, angry outbursts, distrust, detachment, exaggerated emotions, confusion, and neglect of self-care. (R. 459-60).

Ms. Miemczewski and Ms. Morgan felt Mr. Brynelsen was moderately impaired in several daily living activities, including in his ability to manage health issues, to maintain stable housing, to communicate with others, and to manage money. The therapists also characterized his homemaking, skills for financial self-support, coping skills, behavioral norms, and personal hygiene as moderately impaired. (R. 480). The therapists concluded that Mr. Brynelsen continued to meet the criteria for bipolar disorder and that the symptoms of the disorder were mostly controlled by medication. (R. 483). They also diagnosed him with an unspecified personality disorder, finding that he exhibiting symptoms such as angry outbursts, distrust of others, detachment, and exaggerated

8

expression of emotions. (R. 483-84).

As of September 2016, Mr. Brynelsen was still attending individual counseling sessions at the Kenneth Young Center with recovery therapist Samantha Miemczewski. (R. 453). In her reports, Ms. Miemczewski noted that Mr. Brynelsen was making minimal progress towards his goals of building self-esteem and developing a sense of purpose. (R. 453). The record also reflects that he was still meeting with Dr. Gibbons for medication monitoring evaluations in September 2016. (R. 443). At that time, he was prescribed Lorazepam and Wellbutrin to treat his symptoms. (R. 361, 455).

In February 2017, Dr. Gibbons referred Mr. Brynelsen to Brian Leahy, Ph.D, for a series of neuropsychological tests. (R. 515). Mr. Brynelsen's estimated IQ score suggested Mr. Brynelsen's premorbid intellectual functioning to be in the high-average range, and other test results indicated that Mr. Brynelsen's current overall intellectual functioning to be average. (R. 517-18). In measures of attention, cognitive efficiency, and executive functions, Mr. Brynelsen's performance was mildly deficient on timed tasks involving sustained attention, motor speed, and other factors. (R. 518). Mr. Brynelsen scored above average for his age on the tests that measured his learning and memory and language abilities. (R. 519). His visuospatial perception scores were also in the high average range, but his fine motor dexterity results were in the mildly impaired range. (R. 519).

Dr. Leahy's assessment of Mr. Brynelsen's social communication skills led him to determine that Mr. Brynelsen's behavioral symptoms were consistent with a diagnosis of Asperger's syndrome, on the Autism Spectrum at Severity Level 1. (R. 520). Mr. Brynelsen's cognitive performance also supported a diagnosis of Attention-Deficit/Hyperactive Disorder, and his reported feelings of chronic depression meet the criteria of Major Depressive Disorder, which Dr. Leahy characterized

as moderately severe.[3] (R. 520). Dr. Leahy also recommended that employment or other productive activities would likely benefit Mr. Brynelsen and improve his quality of life. (R. 521). He specified that Mr. Brynelsen should seek jobs that are consistent and specific and that involve limited or structured interactions with coworkers and customers. (R. 521).

## C. The Administrative Hearing Testimony

### 1. Mr. Brynelsen's Testimony

At the administrative hearing on October 17, 2016, Mr. Brynelsen testified that it is when he is anxious or stressed, it is difficult for him to work because he experiences bouts of depression that cause his body to "shut down" and "descend into a sort of vegetative state." (R. 38-39). He said he becomes distracted and struggles to concentrate on individual tasks, which he thought was due to attention deficit disorder.[4] (R. 45). "[S]tressful people" or "stressful situations" compound his struggle to focus by causing him to "go into a defensive mode," in which he will try to escape or avoid the stressful situation as a coping mechanism. (R. 46).

Mr. Brynelsen related how he was terminated from his last job at Wal-Mart in 2012, after a stressful encounter with a customer. (R. 39). He said that he worked in the automotive department and was responsible for checking in customers' vehicles for service. (R. 39). He described becoming gradually more stressed when a customer asked him several questions and kept changing her mind. He explained how his anxiety escalated because he was unable to remove himself from the situation to calm down, leading him to act rudely towards her. (R. 40). He claimed that it was the customer's

---

[3] Mr. Brynelsen's diagnoses were not included in the parties' Joint Statement of Facts. They were, however, considered by the Appeals Council in their review of the ALJ's decision. (R. 10, 13).

[4] Mr. Brynelsen had not been diagnosed with Attention-Deficit/Hyperactive Disorder at the time of the administrative hearing. Dr. Leahy diagnosed him in February 2017. (R. 520).

complaint to his supervisor, following his rude behavior, which led to him being fired. (R. 40).

Mr. Brynelsen does not have a valid state driver's license, but he lives alone, cooks, and performs basic household chores (such as vacuuming, and cleaning his bathroom). (R. 43-44). However, he performs these tasks at his own pace, and he often cleans just one area of his condo per day. (*Id.*). When asked about his daily routine, Mr. Brynelsen stated that he typically reads, watches television, and searches for job openings. (R. 44). He said most jobs that he applies for require "little or any physical contact with the public." (R. 49). Despite his reported struggles with social interactions, he testified that his friends visit his apartment and that he chats with neighbors. (R. 44). He also stated that he keeps in contact with a large circle of social media friends. (R. 44).

Mr. Brynelsen testified that he currently takes Lorazepam and Wellbutrin to treat his depression and anxiety, and he stated that he is well-adjusted to the side effects of the medications. (R. 37). He met with his psychiatrist, Dr. Gibbons, every three months at the Kenneth Young Center for a medication evaluation. (R. 38). He said that Dr. Gibbons assessed how his medications are working and whether any changes in his treatment are required. (R. 42). He reported that Dr. Gibbons prescribed Lorazepam to treat his anxiety after he had a verbal outburst at a hospital while receiving treatment. (R. 42). Mr. Brynelsen also met with a therapist at the Kenneth Young Center. (R. 38). Mr. Brynelsen sought treatment at the facility in 2012 after experiencing "rather catastrophic events in [his] life." (R. 41). He reported having a "mental collapse" and being temporarily evicted from his home. (R. 41-42). His family members were able to correct the issue, and in return, they insisted that he seek out psychiatric care. (R. 42). Additionally, Mr. Brynelsen testified that he meets with a counselor at the Kenneth Young Center's vocational center for assistance in pursuing job leads. (R. 49). He testified that he has interviewed for "seven or eight [jobs] in the last couple months." (R. 50).

## 2. Vocational Expert's Testimony

Ms. Dani Mallory testified as the vocational expert at the hearing. In response to the ALJ's hypothetical, Ms. Mallory testified that an individual with no exertional limitations, who should avoid hazards including unprotected heights and dangerous machinery (such as ladders, scaffolds, or ropes), who can complete simple, routine, and repetitive tasks, who cannot be subject to production quotas, who requires a static workplace environment, and who should have no contact with the public and only brief, superficial contact with other employees would not be able to find work in the national economy. (R. 51-52). However, Ms. Mallory was confused about the ALJ's definition of production quota, as she indicated that "all occupations require some sort of production quota." (R. 52). After the ALJ specified that he meant "no piece work," Ms. Mallory identified three occupations in the national economy (each at a medium exertion level) that such a hypothetical person would be able to perform: inspector (DOT 409.687-010), cleaner (381.687-018), and sorter (DOT 609.685-010).[5] (R. 52-53).

The ALJ added to his hypothetical, stipulating that this person would be off task fifteen percent of the workday. Ms. Mallory responded that, based on her experience, there would be no work in the national economy for this hypothetical individual. (R. 54). Mr. Brynelsen's attorney asked Ms. Mallory if the ALJ's hypothetical person could not perform jobs with production quotas, then whether that individual would be unable to perform those three positions she cited—Ms. Mallory responded in the affirmative. (R. 54). The ALJ interjected that he meant no piece work, and

---

[5] The parties' Joint Statement of Facts incorrectly summarizes Ms. Mallory's testimony as finding that "no production quotas or piece work" are conditions that, if either are met, would preclude the ALJ's hypothetical individual from performing any job in the national economy. (Joint Statement of Facts, 6). After the ALJ revised his hypothetical, limiting no production quotas to just no piece work, Ms. Mallory listed three potential occupations that would be available to this hypothetical person. (R. 52-53).

Ms. Mallory further clarified that the positions she cited have "end-of-the-day work . . . requirement goals" that are "not specific to other employees or their production rate is not dictated by a machine." (R. 54).

## II.

### ALJ's Decision

The ALJ found that Mr. Brynelsen did not engage in substantial gainful activity since May 8, 2014—the alleged onset date of his disability. (R. 21). He found that Mr. Brynelsen has the following severe impairments: bipolar disorder, affective disorder, and anxiety. (R. 21). He ruled that autism and learning disability are not severe impairments because it was not clear whether either condition was a medically determinable condition, and he cited a lack of medical evidence in the record that demonstrated they caused more than a minimal restrictions. (R. 21). The ALJ found that Mr. Brynelsen was obese based on his height and weight, but he concluded it was not a severe condition since his obesity did not impose more than a minimal restriction on his ability to perform work-related activities. (R. 21-22). The ALJ found that Mr. Brynelsen's bipolar disorder, affective disorder, and anxiety did not meet or medically equal the criteria of listings 12.04 or 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. (R. 22).

The ALJ found that Mr. Brynelsen has mild restrictions in activities of daily living, mild difficulties in his social functioning, and moderate difficulties in his concentration, persistence, or pace. (R. 22). There were no extended episodes of decompensation.[6] (R. 22). Mr. Brynelsen's

---

[6] The four areas of mental functioning assessed under "paragraph B" of "12.00 Mental Disorders" of 20 C.F.R. Part 404, Subpart P, Appendix 1 were amended January 17, 2017. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66, 138 (Sept. 26, 2016). The four current categories are (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(E); *see also* Revised

(continued...)

limitations also did not satisfy "paragraph C" criteria. (R. 23). To determine Mr. Brynelsen's level of impairment in daily living, the ALJ weighed his sister's, Ms. Rimac's, testimony (describing his difficulties with personal care, household chores, and financial planning) against the record as a whole. (R. 22). The ALJ specifically found that Mr. Brynelsen's testimony about his recent job interviews, his testimony about his relatively independent living situation, and the evidence of his volunteer work, to indicate a less severe impairment in activities of daily living than what his sister had described. (R. 22).

In finding that Mr. Brynelsen had mild difficulties in social functioning, the ALJ considered evidence of Mr. Brynelsen's tendency to isolate himself and his difficulties getting along with others. (R. 22). The ALJ looked at Mr. Brynelsen's capacity to interview for jobs and his testimony at the administrative hearing as evidence that demonstrated more mild difficulties in this area. (R. 22). He pointed to his testimony about his social interactions with neighbors and social media friends, his volunteer work at a local soup kitchen, his participation in group activities at church, and his ongoing job search with staff at the Kenneth Young Center. Additionally, the ALJ observed that he was able "to participate in the hearing in a meaningful, polite and cooperative manner . . . ." (R. 22).

The ALJ found that Mr. Brynelsen had moderate difficulties in maintaining concentration, persistence, or pace. (R. 22). The ALJ noted that he was a college graduate and that he was fired from his last job for reasons unrelated to concentration. (R. 22). The ALJ observed that, during his administrative hearing, Mr. Brynelsen's concentration did not appear to be impaired, he

---

[6](...continued)
Medical Criteria for Evaluating Mental Disorders, 75 Fed. Reg. 51,336, 51, 340 (Aug. 19, 2010) (proposing updates to paragraph B criteria).

demonstrated good ability to recall information, and he declined to take a break. (R. 22-23). The ALJ explained that his finding of moderate difficulties, in this area, was based on Mr. Brynelsen's and Ms. Rimac's testimonies, which both alleged that Mr. Brynelsen's memory, concentration, understanding, task completion, and ability to follow directions are deficient. (R. 23). The ALJ also took note of the mental status evaluations in the record that indicated he has fair judgment and limited insight. (R. 23).

In his RFC assessment, the ALJ determined that Mr. Brynelsen had the ability to perform a full range of work at all exertional levels, but with non-exertional limitations. (R. 23). He imposed the following conditions on the work he could perform: he should not climb ropes, ladders, or scaffolds; he is limited to simple, routine, repetitive tasks; he should not perform piece work; he should have no contact with the public and only brief contact with co-workers or supervisors; and he should avoid hazards including heights and dangerous machinery. (R. 23). The ALJ continued that, in making these findings, he considered Mr. Brynelsen's symptoms to the extent that they are consistent with objective medical evidence. He also stated that he considered opinion evidence. (R. 24).

The ALJ summarized Mr. Brynelsen's allegations: feelings of worthlessness, suicidal thoughts, dark thoughts, physical aches, an inability to perform simple tasks, and anxiety. (R. 24). He noted that Mr. Brynelsen testified that these symptoms date back to his childhood, and that he experienced a "catastrophic event" that caused him to suffer a "mental collapse." (R. 24). He also noted that Mr. Brynelsen described having "adult ADD" that hinders his memory and ability to concentrate. The ALJ also noted Mr. Brynelsen's testimony regarding his depression and anxiety, including reports of going into a "vegetative state" and experiencing panic attacks. (R. 24). Additionally, the ALJ observed that Mr. Brynelsen takes medication for his bipolar disorder and that

he no longer experiences side effects. (R. 24). He stated formulaically that although Mr. Brynelsen's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence . . . ." (R. 24).

After describing Mr. Brynelsen's alleged impairments, the ALJ gave some consideration to the findings of non-examining state agency consultants, Dr. Hamersma and Dr. Kravitz, who found moderate restrictions in Mr. Brynelsen's activities of daily living, social functioning, and concentration, persistence, or pace. (R. 25). However, the ALJ went on to state that, after considering all the evidence, he found "less restrictions in activities of daily living and social functioning." (R. 25). In making this determination, the ALJ relied again upon Mr. Brynelsen's testimony about recent job interviews, his daily activities, his social interactions, and his conduct at the administrative hearing. Additionally, the ALJ felt that Mr. Brynelsen's level of functioning was higher than what Dr. Gibbons indicated when he assessed him with a GAF score of 50, stating that "the overall evidence shows a higher level of functioning than the scores represent." (R. 25). He cited the same evidence in support of this determination as well. The ALJ noted Mr. Brynelsen's moderate restriction in concentration, persistence, or pace.

To account for this limitation, the ALJ stated that he should be limited to "simple, routine, repetitive tasks; no piece work; and work with few, if any, work place changes." (R. 25). Although the ALJ only found mild restrictions in social functioning, he limited the Mr. Brynelsen to "no contact with the public, and only brief and superficial contact with co-workers and supervisors." (R. 25). Additionally, the ALJ found that he should not climb ladders, ropes, or scaffolds due to his non-severe obesity, and he should avoid hazardous work conditions because of the combination of his impairments and the possible side effects of his medication. (R. 25).

16

The ALJ decided that Mr. Brynelsen could not perform any past relevant work because it would cause him too much stress and involve too much contact with people. (R. 26). He determined that Mr. Brynelsen's ability to perform work at all exertional levels was impaired by his non-exertional limitations. Based on the vocational expert's ("VE") testimony, he found that Mr. Brynelsen could perform jobs that exist in significant numbers in the national economy. Specifically, the ALJ, relying on the VE, found that Mr. Brynelsen could work as an inspector (175,000 jobs nationally), industrial cleaner (800,000 jobs nationally), and sorter (90,000 jobs nationally). (R. 27).

Finally, having established that the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles, the ALJ ruled that because Mr. Brynelsen was capable of "making a successful adjustment to other work that existed in significant numbers in the national economy," a finding of "not disabled" was appropriate. (R. 27).

## IV.

### A. Standard of Review

The court must affirm the Commissioner's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). Substantial evidence is "such relevant evidence that as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The standard of review is deferential, and the court may not reweigh the evidence or substitute its own judgment for that of the ALJ. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Skinner v. Astrue*, 487 F.3d 836, 841 (7th Cir. 2007). Even if reasonable minds might come to different conclusions after reviewing the same evidence, it is the ALJ's responsibility to resolve such discrepancies. *Elder*, 529 F. 3d at 413; *see also Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996). However, the court does not simply "rubber stamp" the ALJ's decision. *Scott v.*

*Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). If the ALJ's decision "lacks evidentiary support or is so poorly articulated to permit meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

In the Seventh Circuit, in addition to relying on substantial evidence, the ALJ must construct an "accurate and logical bridge" between the medical evidence and his determination when denying social security benefits. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). In other words, as with any decision, the ALJ must rest his or her denial of benefits on "adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The ALJ may not selectively rely on evidence in the record that supports his conclusion, nor may he ignore entire strands of evidence that run contrary to his conclusion. *See Plessinger v. Berryhill*, _F.3d_, 2018 WL 3965887 (7th Cir. 2018); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). The ALJ is not required to examine every piece of evidence, but his analysis must be articulated well enough to permit meaningful review. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014); *Steele*, 290 F.3d at 940.

### B. Five-Step Sequential Analysis

Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration provides a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. § 404.1520 (a)(4). The claim does not proceed, if any of these steps, the ALJ finds the claimant not to be disabled. *Id.*

1. Is the plaintiff engaged in substantial gainful economic activity? 20 C.F.R. § 404.1520(a)(4)(i).

2. Does the plaintiff have a severe medically determinable impairment or combination of impairments? 20 C.F.R. § 404.1520(a)(4)(ii).

3. Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling within the regulations? 20 C.F.R. § 404.1520 (a)(4)(iii). Before proceeding to step four, the ALJ must also determine the claimant's RFC. 20 C.F.R. § 404.1520(a)(4), (e).

4. Given the claimant's RFC, does the claimant have the ability to perform his past relevant work? 20 C.F.R. § 404.1520(a)(4)(iv).

5. Is the claimant able to perform any other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

The ALJ bears the burden at this step to prove that the work that the claimant can perform exists in significant numbers in the national economy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir.2005); 20 C.F.R. § 404.1520(g)

## C. Analysis.

We begin, and focus on, Mr. Brynelsen's argument that the ALJ erred when he "ignored or downplayed" Mr. Brynelsen's GAF scores of 50 assigned to him by his treating physician Dr. Gibbons, as well as other treatment records from the Kenneth Young Center that demonstrate greater than "moderate" difficulties in concentration, persistence, or pace. [Dkt. #22, at 3]. The ALJ is not required to evaluate every strand of evidence in the record in reaching his disability determination, but his conclusions must rely on all relevant evidence in the record. *See, e.g.*, *Murphy v. Colvin*, 759 F.3d 811, 817 (7th. Cir. 2014); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ may not select only the evidence which supports his ultimate decision, while ignoring evidence that supports a disability finding. *Id.* Here, the ALJ certainly didn't ignore Mr. Brynelsen's GAF scores; he cited to various points in the record where they are to be found. (R. 25). *Compare Price v. Colvin*, 794 F.3d 836, 839 (7th Cir. 2015); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014).

As for whether he "downplayed" them, that's another story. Mr. Brynelsen's GAF scores of 50 – and at least one of 45 – indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Jelinek v. Astrue*, 662 F.3d 805, 807n.1 (7th Cir. 2011). The 50 scores are just on the cusp of the next category of scores indicating "moderate" impairment in functioning. *Jelinek*, 662 F.3d at 807. The ALJ determined Mr. Brynelsen had a moderate impairment in maintaining concentration, persistence, and pace, and just mild restrictions in daily living and social functioning. (R. 22-23).

Before continuing, it's worthwhile to discuss a bit about the position that GAF scores hold in the realm of Social Security disability law. The DSM-V, the latest version of the American Psychiatric Association's Diagnostic and Statistical Manual from 2013, abandoned the GAF scale for the World Health Organization's Disability Assessment Schedule. *Gerstner v. Berryhill*, 879 F.3d 257, 263 n.1 (7th Cir. 2018); *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013). But change comes slowly, and the Social Security Administration still instructs ALJs to treat GAF scores as medical-opinion evidence. *Id.*; *see also Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017). That makes perfect sense as, given the pace at which Social Security proceeding move – dictated by the multiple opportunities for appeals at both the administrative and federal court levels and the sheer volume of applications, the GAF score was and will be a part of case files long after 2013. The point to be taken away from all this is simply that the ALJ was required to treat the GAF scores in this case like opinion evidence. *Gerstner*, 879 F.3d at 263 n.1; *see also Knapp v. Berryhill*, – Fed.App'x. –, –, 2018 WL 3409606, at *4 (7th Cir. 2018).

The ALJ explained his rejection of the GAF scores as follows:

the overall evidence shows a higher level of functioning than the scores represent. In particular, the undersigned notes the claimant's testimony regarding his job interviews, social networks, and daily activities. The undersigned notes the claimant's ability to participate in group activities at church, volunteer in a soup kitchen, and ongoing interactions including job hunting with the Kenneth Young Center for Assistance. The undersigned also notes again the claimant's ability to participate in the hearing in a meaningful, polite and cooperative manner while demonstrating good recall and no overt signs of agitation.

(R. 25). The ALJ also had to reject the opinions of three agency reviewing physicians, at least in regard to limitations in daily activities and social functioning, who found Mr. Brynelsen was moderately impaired across the board. (R. 25, 64, 76, 356-58). Again, to do so, the ALJ relied on Mr. Brynelsen's testimony, specifically as to doing chores around the house at his own pace, chatting with neighbors and friends and going on Facebook, participation in church group activities and job hunting through the Kenneth Young Center. (R. 25).

So, the basis for the ALJ to reject the assessments of not only Mr. Brynelsen's treating doctor and mental health care professionals at the clinic – assessments formed in the course of regular treatment over an extended period – and the agency's own reviewing physicians, was Mr. Brynelsen's own testimony about his activities. An ALJ must weigh medical opinions by applying a number of factors, *Lambert v. Berryhill*, – F.3d –,–, 2018 WL 3470994, at *5 (7th Cir. July 19, 2018), including the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018); *Gerstner*, 879 F.3d at 263. Here, the ALJ made no note of any of these factors in his discussion of the GAF scores from Dr. Gibbons and the clinic or in his discussion of the opinions from the three reviewing physicians. (R. 25).

Notably– and contrary to the assertion in the Commissioner's brief [Dkt. #25, at 8] – the ALJ does not cite to any *medical* evidence that might be contrary to the medical opinions, from either the period before or after Mr. Brynelsen's insured status expire.  Indeed, the only findings from the medical evidence the ALJ pointed to in support of his conclusions that Mr. Brynelsen was moderately limited in concentration and only mildly limited in other areas were a number of treatment notes "which show[ed] fair judgment and limited insight."  (R. 23).  Oddly, nearly all of the evidence the ALJ chose to rely comes from the period *after* Mr. Brynelsen's insured status expired.  (R. 25 (*citing* exhibits 7F, 8F)).  But, more to the point, what judgment and insight have to do with concentration the ALJ does not say.  There's certainly no logical bridge there.  And, more importantly, he didn't even mention any of the treatment notes from before the expiration of Mr. Brynelsen's insured status regarding serious impairments to his ability to complete daily chores (*see, e.g.*, R. 265, 267, 268, 316, 362), engage in social activity *(see, e.g.*, R. 63, 265, 276, 277, 289, 297, 304, 316, 325, 327), and concentrate.  (*See, e.g.* R. 251, 293, 304, 320).[7]  An ALJ cannot ignore evidence that runs counter to his conclusion; especially while focusing on evidence that supports it.  *Kaminski v. Berryhill*, 894 F.3d 870, 874–75 (7th Cir. 2018); *Gerstner*, 879 F.3d at 261–63; *see also Plessinger v. Berryhill*, 2018 WL 3965887, at *7(ALJ's did not allow the court to "discern . . . whether [he] considered and dismissed, or completely failed to consider, this pertinent evidence, . . . .").

---

[7] The ALJ also ignored all the medical evidence dated after the expiration of Mr. Brynelsen's insured status. Hhe said he considered it, but didn't cite to any of those reports regarding Mr. Brynelsen's serious issues, aside from his rejection of all of the GAF scores.  (R. 25).   Of course, in the case of an pre-existing, chronic impairment, evidence from after the expiration of the claimant's insured status is not necessarily irrelevant, see *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010); *Halvorsen v. Heckler*, 743 F.2d 1221, 1226 (7th Cir. 1984), as the Commissioner tacitly concedes by including it in the parties' joint stipulation of facts. [Dkt. #23, at 3-4].

In the end, the ALJ went with his own assessment of Mr. Brynelsen's allegations about his symptoms and discarded the assessments of Mr. Brynelsen's treating physician and psychologist, not to mention the opinions of the agency reviewing physicians. By necessity, a patient's self-reports often form the basis for psychological assessments. *Knapp*, – Fed.App'x. –, 2018 WL 3409606, at *3; *Gerstner*, 879 F.3d at 262; *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015). So, what the ALJ did here was to elevate his own evaluation of those self-reports over the assessments of mental health professionals. This, the ALJ was not allowed to do. *See Lambert*, – F.3d at –, 2018 WL 3470994, at *4 ("ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves."); *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018)(same); *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014)(chastising ALJ for making his own psychological assessment of the findings); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014)("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.").

Then there is the testimony the ALJ relied on to discredit all that expert medical opinion. As already noted, the ALJ was impressed by Mr. Brynelsen's "job interviews, social networks, and daily activities." (R. 25). But, when considering a claimant's testimony about activities, an ALJ can't disregard the claimant's limitations in performing those activities. *Meuser v. Colvin*, 838 F.3d 905, 913 (7th Cir. 2016); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *see Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). The ALJ didn't do that here. While it is true that Mr. Brynelsen said he chats with neighbors from time to time and had friends on Facebook (R. 44), he also said that he is withdrawn, shuts down under stress, and that he can be stressed by social situations and need to escape. (R. 38, 45-46). Obviously, a brief chat with a neighbor or an online circle of friends are not

real tests of dealing with the stress of a social or job situation. Of the few job interviews he had, a number were over the phone so, again, the stress is somewhat reduced. "Persisting in looking for employment even while claiming to suffer from a painful disability might simply indicate a strong work ethic or overly-optimistic outlook rather than an exaggerated condition." *Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016). Moreover, he said he volunteers with his church, but only once a week. (R. 397). Interactions with family at events were stressful, and he sought to avoid them. (R. 263-65). And, as already noted, he reported consistently to his doctor and psychologist that he was withdrawn and isolated. *Cf. Meuser*, 838 F.3d at 913 (ALJ could not ignore evidence that claimant was reclusive).

As for daily activities, he testified that he can only manage one limited chore – cleaning a sink, vacuuming a room – in a day. (R. 43-44). *Cf. Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016)(ALJ cannot ignore fact that claimant determines pace of household chores). He has trouble completing a task; he begins them and abandons them. (R. 44). He was unable to follow through with questionnaires his doctor gave him to complete at home and bring back. His sister has indicated he does not attend to hygiene and seems unaware of this. (R. 213).

Thus, the ALJ rejected, in varying degrees, the only medical opinions in this case. He either ignored, or failed to mention, relevant medical evidence underlying those opinions. He then arrived at his own assessment of Mr. Brynelsen's psychiatric condition, relying on what he deemed were significant activities. He glossed over or ignored the fact that those activities were restricted or isolated. This he cannot do. *Plessinger, supra.* Accordingly, this case must be remanded for further proceedings.

Still, some additional observations are in order. Moving on from his assessment of Mr.

Brynelsen's psychiatric condition, the ALJ found that Mr. Brynelsen's ability to maintain concentration, persistence, and pace was only moderately restricted. (R. 22). When questioning the vocational expert ("VE") at the administrative hearing, the ALJ incorporated this restriction into his hypothetical by asking the vocational expert whether there were any jobs involving "simple, routine, repetitive tasks; [and] no production quotas." (R. 52). When the VE responded that there would be no jobs, the ALJ changed his tack and said: "[a]ll right. No piece work. I said no production quotas, no piece work." (R. 52). The VE then said that would allow for three jobs: inspector (DOT 409.687-010), industrial cleaner (DOT 381.687-018), and sorter (DOT 609.685-010). (R. 52-53). The ALJ also asked whether there were any jobs if Mr. Brynelsen were off task for 15% of the workday. The VE said that 15% was the "top end of the tolerance . . . at 15 and over, there would be no work." (R. 54).

Mr. Brynelsen's counsel understandably wasn't clear on the difference between production quotas and piece work and asked the VE about it. The VE explained that, for her, the ALJ's "no piece work restriction" meant jobs that were "not specific to other employees or their production rate is not dictated by a machine." (R. 54).

For some reason, the Commissioner stipulated to the fact that "[t]he vocational expert testified that there would be *no jobs available* to an individual who could work at all exertional levels, but who had the following non-exertional limitations: . . . no production quotas or piece work . . . ." [Dkt. #23, ¶18 (emphasis supplied)]. So, if Mr. Brynelsen couldn't do piece work – which was the ALJ's hypothetical and RFC finding – there'd be no jobs for him. He'd be disabled and that would doom the Commissioner's case. Because the case has to be remanded anyway, however, the Commissioner's improvident concession will be overlooked. *See, e.g, United Auto*

*Ins. Co. v. Veluchamy*, 747 F.Supp.2d 1021, 1024 (N.D.Ill. 2010).

As was pointed out in the initial review of this case, the ALJ's "simple, routine, repetitive tasks" restriction really has little or nothing to do with a moderate restriction on concentration persistence and pace. *See, e.g., Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015)(hypothetical question positing a person capable of performing "simple, routine, and repetitive tasks" but unable to perform work involving "fast paced production" did not account for difficulties maintaining concentration, persistence, and pace); *Yurt*, 758 F.3d at 858–59 ("we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)("In most cases ... employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."). To the ALJ's credit, he didn't stop there, but added "no production quotas." But when that resulted in a "no jobs" response from the VE, the ALJ changed it to "no piece work." It's not entirely clear that's a valid proxy for a moderate concentration impairment, as Seventh Circuit case law has suggested. *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016)("Yet the Commissioner has not cited, nor have we found, any authority supporting the ALJ's speculation that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including, as part of the claimant's mental residual functional capacity, a moderate limitation on concentration, persistence, and pace.").

The ALJ failed to define "piece work", which is cause for concern in regard to what the VE thought he meant by it. *See, e.g., Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015)*("It is also

problematic that the ALJ failed to define 'fast paced production.' Without such a definition, it would have been impossible for the VE to assess whether a person with [plaintiff]'s limitations could maintain the pace proposed.").  The VE took it to mean work with a pace not tied to other employees or machines.  But, even so, the VE said this would include "sorter" which, per the Dictionary of Occupational Titles, is actually "ball sorter." (DOT 609.685-010). According to the DOT, the job involves tending a machine and visually inspecting metal balls as they come out of the machine, sorting them by size. https://occupationalinfo.org/60/609685010. html.  Based on the brief DOT description – which is 40 years old, *see Spicher v. Berryhill*, – F.3d –, –, 2018 WL 3677566, at *4 (7th Cir. Aug. 3, 2018)("The DOT is 'obsolete.'"); *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)[8] – it would seem that this is work dictated by the pace of a machine.  At the very least, the job of sorting balls of varying sizes all day, every day, would seem to fit into most people's definitions of "piece work."  All this makes it very difficult to call the vocation evidence in this case "substantial."

Rather than cite any evidence to the contrary, or offer any reasoned argument as to why these observations are not significant and telling, the Commissioner dismisses these concerns as a "lay assessment of  the vocational characteristics of a 'ball sorter' job . . ." [Dkt. #19, at 8].  But a lawyer's unsupported assertion in a brief is no better; it's neither evidence nor an argument. *I.N.S. v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 679 (7th Cir. 2016)("But saying so does not make it so . . . ."); *Gross v. Knight*, 560 F.3d 668, 672 (7th Cir. 2009).

---

[8] The other two jobs, industrial cleaner and agricultural inspector grader, were last updated in 1988 and 1980, respectively.

We understand that the Commissioner is up against it in these situations in the Seventh Circuit, having been taken to task time and again, with the court apparently finally exhausting its patience most recently in *Spicher*, where it simply rejected any reference to the DOT. *Spicher,* – F.3d at –, 2018 WL 3677566, at *4. But this type of thing does not move the needle in the Commissioner's direction. Surely, the Commissioner does not think a court must simply accept uncritically that the vocational evidence in this case – a 1977 laconic entry about a job involving tending a machine and sorting balls – is persuasive, let alone conclusive. Or that it must be blindly accepted. Other than the antiquated listing, there is no persuasive proof that the job of ball sorter actually exists in sufficient numbers and, more importantly, that it involves something that is functionally different than piecework.

The machine obviously will operate at a set, continuous rate and produce a prescribed output in a defined or prescribed period. To say that that is not piecework or that piecework is not involved is to ignore reality and to be overly consumed with semantics. It is well to recall that "there is no magic in words," *Briscoe v. Bank of Commonwealth of Kentucky*, 36 U.S. 257, 347 (1837), and it is imperative that "[w]e must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 460 (1889). In sum, the reality is in this case is that the job of ball sorter necessarily involves "piecework," which the ALJ acknowledged was inappropriate for Mr. Brynelson.

Finally, the numbers claimed for even these jobs are suspect. Following the VE's testimony as to jobs and the numbers of jobs in the national economy, the ALJ asked, "[t]estimony consistent with the information in the DOT?" To which the VE replied, "[y]es, Your Honor." (R. 53). But the

numbers didn't come from the DOT, as the Seventh Circuit has repeatedly pointed out. *See, e.g.,* *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). And if they did, again, the DOT is obsolete. *Spicher*, – F.3d at –, 2018 WL 3677566, at *4. So, the question remains, what is the basis for them?

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. # 21]is granted insofar as this case is remanded to the Commissioner for further proceedings, and the defendant's motion for summary judgment [Dkt. #24] is denied.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 9/14/18